PUCKETT *v.* GLENDENNING.

## Opinion delivered June 10, 1918.

1. GUARDIAN AND WARD—SALE OF WARD'S LANDS—DISCHARGE OF GUARDIAN.—An order of the probate court, touching a guardianship, recited that the guardian's accounts and report were correct, and "same is fully approved and confirmed and ordered recorded * *. * and the said guardian with sureties are hereby discharged and released from any further liability thereon." On the same day the court made an order directing the guardian to sell certain lands for the maintenance and education of the minors. *Held,* the order of sale was not made after the discharge of the guardian.

2. HOMESTEAD—SALE BY GUARDIAN—VALIDITY.—A probate sale by a guardian of a minor's homestead inherited from his deceased father is void where the order of sale does not show that there were no debts existing against the minor's deceased father.

3. APPEAL AND ERROR—FINDING OF CHANCELLOR.—Shortly before his death, deceased moved from one farm to another, continuing to own both at the time of his death. *Held,* where it is difficult to determine where the preponderance of the testimony lies, the finding of the chancellor as to which farm constituted deceased's homestead would not be disturbed on appeal.

Appeal from Ouachita Chancery Court; *James M. Barker,* Chancellor; affirmed.

STATEMENT OF FACTS.

Alice P. Puckett brought this suit in equity against Mrs. Margaret Glendenning to set aside a deed to certain lands made pursuant to a guardian's sale in the probate court and to have her title to said lands quieted against the defendant. She alleges that the sale made by her guardian under orders of the probate court, was void; (1) Because at the time of said sale her guardian had been discharged and the probate court had no jurisdiction over her property and, (2) Because at the time of said sale said lands constituted her homestead. Frank Polk, the father of the plaintiff, owned two tracts of land including the tract in controversy in Ouachita County, Arkansas. He had a wife and five children. He first lived on a tract of land known as the Old Polk Place and this was his homestead. All of his children were born on this place. He had a good substantial dwelling house

and a good barn and outhouses. In the fall of 1899, he moved on the land in controversy which was in the bottoms and which for convenience will be hereinafter known as the bottom place. He had about one hundred head of cattle and moved on the bottom place because he had a better pasture there. He sold off some of his horses and mules but moved all of his other property, including a saddle horse and a team of mules to the bottom place. He lived there with his family until sometime in March, 1900, when he died. He left surviving him his widow and five children. His widow continued to live on the bottom place with her children for about one year and then moved to town. Letters of guardianship were issued to the widow upon the person and property of the plaintiff and the other children, who were minors. On the 3rd day of the October term, 1906, of the probate court, which was on Saturday, October 20, 1906, Mrs. Mittie Polk, as guardian of the plaintiff and the other minor children, filed what she called her third annual and final settlement as such guardian. On the same day the probate court made an order directing her as guardian to sell the lands in controversy for the maintenance and education of said minors. The lands were duly sold in compliance with the order of the court to L. T. Dale for the sum of $1,377, the same being more than three-fourths of their appraised value. The sale was duly approved and confirmed by the probate court and a guardian's deed in regular form was executed to the purchaser. Mrs. Margaret Glendenning purchased the lands from L. T. Dale, the purchaser at the guardian's sale.

Evidence was introduced by the plaintiff tending to show that she was a minor at the time of the guardian's sale and that the lands so sold were the homestead of her mother and herself. On the other hand evidence was adduced by the defendant tending to show that the lands in controversy were not the homestead of the plaintiff and her mother. This testimony will be more particularly set out in the discussion on this branch of the case

in the opinion. The order of the probate court confirming the settlement of the guardian and the order made on the same day directing the sale of the lands in controversy by the guardian will also be more particularly referred to in the opinion.

The chancellor was of the opinion that there was no equity in the plaintiff's complaint and it was dismissed for want of equity. The case is here on appeal.

*H. E. Meek* and *A. N. Meek,* for appellant.

1. The sale was void because the guardian had been discharged. 97 Ark. 189; 92 *Id.* 230.

2. The land was the homestead of the minors. 123 Ark. 389. There is no showing of record that there were no debts against the estate.

*Gaughan & Sifford,* for appellee.

1. There is no order showing the discharge of the guardian. The order merely discharged the guardian and his sureties from liability.

2. The testimony shows that the land was not a homestead. 55 Ark. 55; 56 *Id.* 589; 65 *Id.* 373; 103 *Id.* 574; 19 S. W. 20.

HART, J., (after stating the facts). It is first contended by counsel for the plaintiff that the guardian's sale of the lands in controversy is void because the probate court had approved the final settlement of the guardian and discharged her and the sureties on her bond as such guardian before an order directing the sale of the lands was made. We do not agree with counsel in this contention. On the third day of its October term, 1906, the probate court approved and confirmed what was called the third annual and final settlement of Mrs. Mittie Polk, as guardian of the plaintiff and her other minor children. The order concludes as follows: "The court further finds that said guardian has properly charged herself, with all amounts coming into her hands belonging to her said wards. And that the credits claimed by her are supported by good and valid vouchers, and said settlement being found in all things correct, same is

fully approved and confirmed and ordered recorded in the proper record of settlements of administrators, guardians, etc., and the said guardian with sureties are hereby discharged and released from any further liability thereon.''

(1)   On the same day the court made an order directing the guardian to sell the lands in controversy for the maintenance and education of the minors.   The lands were duly appraised by appraisers thereafter appointed by the probate court and the appraisement was approved by the said court.   On November 14, 1906, the guardian filed her report of sale of said lands and the same was approved and confirmed by the probate court and a deed was ordered to be executed by the guardian to the purchaser.   On Novembr 24, 1907, a petition was filed by the next friend of said minors to have the letters of guardianship of Mrs. Mittie Polk revoked.   On the 20th of January, 1908, Mrs. Mittie Polk filed a response in the probate court to this petition which also purports to be a settlement with her wards for the proceeds of the sale of the real estate in controversy.   The record does not show that the petition or the response were ever acted upon by the probate court.   When the whole record is considered we are of the opinion that the court did not discharge the guardian before the order for the sale of the lands was made.   We think that the only effect of that part of the order which we have quoted above was to approve and confirm the settlement made by the guardian and to discharge and release her and her sureties from any further liability as to the matters embraced in her said settlement.   This is shown by the concluding part of such order as follows:   ''And the said guardian with sureties are hereby discharged and released from any further liability thereon.''   The word ''thereon'' evidently refers to the settlement and not to the discharge from the guardianship.   The fact that the order confirming the guardian's sale and the order directing the guardian to sell the minor's interest in the lands were made on the same day indicates that the court did not

intend to discharge the guardian from the guardianship, but only to discharge and release her and her sureties as to the matters embraced in her settlement. We are strengthened in this view from the fact that the same judge immediately made an order directing her to sell the lands and afterwards appointed appraisers, approved her report of sale and ordered her to execute a deed to the purchaser at the guardian's sale.

In *Ex parte Baldwin,* 118 Ark. 416, it was held that when two orders are made on the same day with reference to the same matter, the subsequent order tends to explain and control the former.

(3) It is also contended that the lands sold constituted the homestead of the minors and that the sale is void because the order of sale does not show that there were no debts existing against their deceased father. See *Ex parte Tipton,* 123 Ark. 389. In that case we held that the record of the probate court in the matter of selling the minor's homestead upon the application of the guardian should show the fact that there were no debts, and that when the record is silent on that point the order of sale is void. The record in the instant case does not contain any showing that there were no debts against the estate. This brings us to the question of whether or not the land ordered sold was the homestead of the minors. The evidence shows that Frank Polk owned two tracts of land in Ouachita County. Prior to the time he moved on the land in controversy, he lived on another tract of land known as the old Polk Place. He had resided there for many years and all of his five children had been born there. He had a comfortable and substantial dwelling house and a good barn and outhouses. He purchased a herd of one hundred head of cattle and in the fall of 1899 moved on the land in controversy where there was a better pasture for his cattle and resided there until his death in March, 1900.

The deposition of the plaintiff was taken on the 6th day of April, 1917. According to her testimony, she was twenty-three years of age and resided at Little Rock,

Arkansas. She had not seen the lands involved in this suit and had never received any of the proceeds from their sale. She had not heard directly from her mother for six or seven years. She stated that at the time of her father's death he was living on the land involved in this suit and that it was his homestead. On cross-examination she stated that she was not able to give the numbers of the particular forty acres of land on which her father resided at the time of his death but that the land in question was the homestead and that they never had any other home; that all of the children were born there and that her grandfather and grandmother were buried there.

Edwin Morgan testified that in the fall or winter of the year 1899, Frank Polk moved on the land in controversy; that Polk told him that the bottom land was better than the land on which he had been living; that Polk did not say anything about how long he was going to live on the bottom place.

Brad Polk testified that Frank Polk was his uncle, and that he was intimately associated with him prior to his death; that in the fall of 1899, his uncle had one hundred head of cattle and moved on the land in controversy because there was better pasture land there; that his uncle did not talk like he would ever move back to the Old Polk Place, but stated that he might go to Texas; that if he did not go to Texas, he thought he would build a house on the bottom place; that he, (witness,) considered the bottom place the only home Polk had when he moved there; that Frank Polk was going to send his cattle to Texas and turn them over to his brother-in-law; that he might move to Texas the next fall if things turned out right; that the bottom place had a good barn and good lots and pastures. On cross-examination he stated that the house on the bottom place was a small one and that a family of negroes had lived in it before his uncle moved there; that Polk cleaned out the house and papered it before he moved in but did not make any other repairs on it.

On behalf of the defendant, J. G. Brummett testified that he had known Frank Polk many years and had been his partner until a few years before his death; that there were 280 acres of land in the old Polk Place and that Frank Polk had been born and raised there; that Frank Polk told him about his plans; that he was buying up cattle to go to Texas; that he rented out the old Polk Place and moved to the bottom place because there were better pastures there for his cattle; that he intended to move to Texas the next spring or fall; that he only intended to live on the bottom place temporarily while buying up cattle preparatory to going to Texas; that the house he lived in on the bottom place was only a shack and that he made no repairs on it except to make it warm; that Polk got sick and died in the spring before he moved to Texas.

William Green corroborated in all respects the testimony of J. G. Brummett. He stated that Frank Polk told him that he was going to Texas in the fall and was going to take his family with him; that he had already been to Texas and had shipped a load of cattle there before his death.

The old Polk Place was the homestead of Frank Polk. He had the right to change his homestead and acquire a new one. The question is did he acquire a new homestead in the bottom place? In determining this question we must consider the intent of Polk as shown by his declarations when he moved to the bottom place as well as the other facts and circumstances in the case. It is manifest that the testimony of the plaintiff sheds no light whatever on the subject. She was twenty-three years of age when she testified in April, 1917. Hence she was only about six years old when her father died and less than that age when he moved from the old Polk Place to the bottom place. It is true she testified that this was his homestead but she also stated that all his children had been born there and that her grandfather and grandmother were buried there. This shows that she was thinking about the old Polk Place and had con-

fused the two places in her mind. This is not to be wondered at when we consider her tender age at the time. This leaves for our consideration only the declarations of Polk when he moved to the bottom place indicating his intention of occupying the place. One witness for the plaintiff testified that Frank Polk told him that he intended to make the bottom place his home. He was a grown man at the time and in some respects is corroborated by a young man who was only about thirteen years of age when Frank Polk moved to the bottom place.

On the other hand two other witnesses, both of whom were grown and one of whom had been for many years the partner of Frank Polk testified that he told them of his plans. They said that he only intended to live on the bottom place temporarily while he was gathering up some cattle preparatory to moving to Texas; that he had already shipped one car load of cattle to Texas and had gone there with them in the spring of 1900 before he died. They stated that he had only moved from his home place to the bottom place while he was gathering up his cattle preparatory to moving to Texas.

(3) The chancellor found that he had not acquired a homestead in the bottom place and the testimony on the subject is conflicting and the question being mainly one of intention as manifested by the declarations of Polk, together with the attendant circumstances, it is somewhat difficult to determine where the preponderance lies. We are unable, however, to say that the conclusion of the chancellor is against the preponderance of the evidence and therefore it is our duty to follow his findings. *Long* v. *Hoffman,* 103 Ark. 574; *Stewart* v. *Pritchard,* 101 Ark. 101. The decree will be affirmed.